IAN N. FRIEDMAN (0068630)
MADELYN J. GRANT (0098165)
Counsel for Defendant
Friedman & Nemecek, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44113
P: (216) 928-7700
E: inf@fanlegal.com
E: mjg@fanlegal.com

Attorneys for Defendant

BENJAMIN C. GLASSMAN (0077466)
Counsel for Defendant
Squire Patton Boggs (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
P: (513) 361-1248
E: benjamin.glassman@squirepb.com

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:18-CR-225 |
| Plaintiff, | MEMORANDUM IN AID OF SENTENCING |
| v. | COURT: Hon. Jack Zouhary |
| JARED DAVIS, | |
| Defendant. | |

# Defendant JARED J. DAVIS's
# MEMORANDUM IN AID OF SENTENCING

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ 3

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT ........................................... 8

I.      PROCEDURAL HISTORY.............................................................................................. 8

II.     REMAINING OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT ........ 9

    *A.     The Tax Loss is not Greater than $100,000*.................................................................. *10*

    *B.     There is Insufficient Evidence of More Than $10,000 from Criminal Activity*............. *12*

    *C.     Mr. Davis's Offense Conduct Did Not Employ Sophisticated Means* .......................... *13*

    *D.     Mr. Davis Did Not Obstruct Justice* ........................................................................... *13*

III.    HISTORY AND CHARACTERISTICS ........................................................................ 14

IV.     SENTENCING STATISTICS FOR SIMILARLY SITUATED OFFENDERS ............ 18

V.      COVID-19 AND ONEROUS CONDITIONS OF CONFINEMENT.............................. 22

VI.     CONCLUSION................................................................................................................ 31

CERTIFICATE OF SERVICE ................................................................................................. 32

## TABLE OF AUTHORITIES

Cases

*Halgren v. City of Naperville*, No. 21-cv-05039, 2021 U.S. Dist. LEXIS 241777, *9-12 (N.D. Ill.) .......................................................................... 27

*Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ....................... 28

*Ruderman v. Kolitwenzew*, No. 20-cv-2082, 2020 U.S. Dist. LEXIS 83163, *5-6 (C.D. Ill. May 12, 2020) ........................................................................ 22

*United States v. Garlock*, No. 18-cr-00418, 2020 U.S. Dist. LEXIS 53747, *1-*2, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) ..................................... 28

*United States v. Huang*, No. 19-cr-00110, 2020 U.S. Dist. LEXIS 58355, *1-*2, 2020 WL 1540483 (N.D. Cal. Mar. 27, 2020) ..................................... 28

*United States v. Powell*, No. 19-cr-00061, 2020 U.S. Dist. LEXIS 62077, *1-*2, 2020 WL 1540485 (N.D. Cal. Mar. 27, 2020) ..................................... 28

Law Reviews

Brandon L. Garrett & Lee Kovarsky, *ARTICLE: Viral Injustice*, 110 Calif. L. Rev. 117, 128-129 (2022) ............................................................................ 30

Sentencing Guideline

USSG §2T1.1 ................................................................................... 10, 13, 18

USSG §3C1.1 ........................................................................................... 14

USSG §5K1.1 ........................................................................................... 18

USSG 2T1.1 ............................................................................................. 12

USSG App. C ........................................................................................... 13

Other Authorities

BOP, *COVID-19 Coronavirus*, "Coronavirus Vaccine Implementation," ............... 27

BOP, *Inmate Age* ...................................................................................... 27

CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* ....................................................... 23

CDC, *Variant Proportions*, ......................................................................... 25

Deidre McPhillips, CNN, *US life expectancy continues historic decline with another drop in 2021, study finds* (Apr. 8, 2022) ......................................... 24

Eddie Burkhalter, et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System* (Apr. 10, 2021) ....................................... 25

*Federal Bureau of Prisons Clinical Guidance* at 1, Oct. 13, 2021 ..................... 28

Hilary Brueck and Shayanne Gal, *Rapid Tests Do Not Always Detect Omicron — Here's How to Know for Sure If You've Got COVID-19 or Not*, BusinessInsider, Dec. 23, 2021 ........................................................... 27

Jake Ellison, *COVID-19: UW Study Reports 'Staggering' Death Rate in US Among Those Infected Who Show Symptoms*, UW News (May 18, 2020) ........................................................................................................... 24

Jamie Ducharme, *We May Be in for Yet Another COVID-19 Surge This Fall and Winter*, Time, Oct. 11, 2022 ................................................. 25

Joe Hilton, et al., *Estimation of country-level basic reproductive ratios for novel Coronavirus (SARS-CoV-2/COVID-19) using synthetic contact matrices*, 16(7) PLoS Comput. Biol. (July 2020) .............................. 24

Joseph Guzman, *New Study Finds Coronavirus Can Cut Life Span by 10 Years or More*, The Hill, May 11, 2020 ........................................ 24

Joseph Wilkinson, *Second COVID booster shot boosts infection protection for just a few weeks: study*, New York Daily News (Apr. 6, 2022)........... 28

Joshua Cohen, *Europe's Emerging Covid-19 Wave Reminds Us That The Pandemic Isn't Over 'Til It's Over*, Forbes, Oct. 6, 2022, ................. 23

Kathryn Krawczyk, The Week, *Even Mild Coronavirus Cases Can Cause Lasting Cardiovascular Damage, Study Shows* (July 28, 2020) .............. 23

Keskin Y, Koz G, Nas K. *What Has Changed in The Treatment of Psoriatic Arthritis After COVID-19?* Eurasian J Med. 2021 Jun;53(2) ............... 22

Kompaniyets L, Pennington AF, Goodman AB, Rosenblum HG, Belay B, Ko JY, et al., *Underlying Medical Conditions and Severe Illness Among 540,667 Adults Hospitalized With COVID-19, March 2020–March 2021*, Prev Chronic Dis 2021;18:210123 ........................................... 22

Lisa B. Puglisi, M.D., et al., *Estimation of COVID-19 Basic Reproduction Ration in a Large Urban Jail in the United States*, 53 Ann. Epidemol. 103-105 (Jan. 2021) ..................................................................... 24

Lisa M. Krieger, *A stunning 300 new COVID variants are circling the globe. Which ones will break through in the Bay Area?*, The Mercury News, Oct. 24, 2022 ...................................................................... 25

Maggie Fox, *Studies Confirm Waning Immunity from Pfizer's Covid-19 Vaccine*, CNN, Oct. 7, 2021 ..................................................... 27

Mary Markos, *'Nightmare' XBB Variant Likely Already Here, Boston Doctors Say*, NBC News Boston, Oct. 25, 2022 ............................... 25

Michelle Fay Cortez, Bloomberg, *Covid Raises Blood Clot, DVT Risks for Months After Even Mild Infection* (Apr. 7, 2022) ......................... 23

*Miguel Escalante, et al. v. U.S. Immigration and Customs Enforcement, et al.*, 1:22-cv-00541-RJL (D.D.C. March 1, 2022) ............................ 26

Thomas R. Frieden, former Dir. of the CDC, The Atlantic, *COVID-19 Is Out Of Control. What Can We Do About It?* (Nov. 13, 2020) ............... 22

U.S. Sentencing Comm'n, *INTER-DISTRICT DIFFERENCES IN FEDERAL SENTENCING PRACTICES Sentencing Practices Across Districts from 2005 – 2017* 10 (Jan. 2020) ........................................................................ 19

U.S. Sentencing Comm'n, *Use of Guidelines and Specific Offense Characteristics Guideline Calculation Based Fiscal Year 2021,*........................................................ 13

IAN N. FRIEDMAN (0068630)
MADELYN J. GRANT (0098165)
Counsel for Defendant
Friedman & Nemecek, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44113
P: (216) 928-7700
E: inf@fanlegal.com
E: mjg@fanlegal.com

BENJAMIN C. GLASSMAN (0077466)
Counsel for Defendant
Squire Patton Boggs (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
P: (513) 361-1248
E: benjamin.glassman@squirepb.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

JARED DAVIS,

                    Defendant.

CASE NO.  3:18-CR-225

MEMORANDUM IN AID OF SENTENCING

COURT: Hon. Jack Zouhary

       Defendant JARED J. DAVIS, 46, having pleaded guilty to three counts of tax evasion and without any substantive criminal history, hereby respectfully suggests that this Honorable Court impose on him a non-custodial sentence of three years' supervised release conditioned on the agreed upon maximum statutory fine of $300,000.00. This case began six years ago. In that time, Mr. Davis has seen and experienced great life change. This has resulted in an evolved person, with an increased appreciation for the truly important aspects of life such as family and health. He does not stand before this Honorable Court as the same man that began this case. This is addressed further herein. In further support thereof, Mr. Davis provides this Honorable Court with the attached Memorandum in Aid of Sentencing.

Dated:  December 28, 2022.

IAN N. FRIEDMAN

*/s/ Ian N. Friedman*

IAN N. FRIEDMAN
Attorney for Defendant

## MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT

## I.     PROCEDURAL HISTORY

On May 1, 2018—over four and one-half years ago and prior to the on-going global pandemic, Mr. Davis was indicted on several counts of wire fraud, money laundering, and obstruction of justice. On August 22, 2018, a superseding indictment was issued charging Mr. Davis with the same counts in the original indictment plus three counts of tax evasion. Mr. Davis was aware of the instant investigation against him beginning on April 22, 2016, when the search warrants were executed. Mr. Davis was not indicted until June 5, 2018, and in the over two years prior to his indictment, Mr. Davis was cooperative with multiple agencies including the Department of Justice, Criminal Division, Fraud Section, in Washington, DC, and the Securities Exchange Commission (SEC). Specifically, Mr. Davis sat for an over ten-hour deposition with the SEC and a three-hour proffer session with the Department of Justice. Mr. Davis proffered information on the binary options businesses, SpotOption specifically, and upon information and belief, provided a great deal of helpful information that was ultimately used in the trial of *United States of America v. Lee Elbaz*.

Importantly, Mr. Davis owned the operations at issue in this case 50/50 with his partner, Mr. Dale Pinchot. To date, Mr. Pinchot has not been arrested or charged in any capacity for his equal involvement and dealings in these matters. Mr. Pinchot had as much as, if not more of, an active role in the day-to-day operations of the business. Further, the minimal profits associated with these businesses and certainly at issue in this case, were split equally between Mr. Davis and Mr. Pinchot.

After years of continued investigation, discovery review, and many meetings between the parties, Mr. Davis pleaded guilty pursuant to a plea agreement to a superseding information charging him only with three counts of tax evasion. Undersigned counsel and Assistant United States Attorney Segev Phillips worked diligently over a period of months to agree upon the terms and facts of the plea agreement regarding Mr. Davis. The Final Presentence Report, however, fails to incorporate the facts agreed upon by both parties and instead simply mirrors the facts outlined in the superseding indictment. Undersigned counsel urges this Honorable Court to refer only to the facts outlined in the plea agreement for purposes of the background and history that brings Mr. Davis before this Court for purposes of sentencing, because these were the facts of the case agreed upon by the government and the defense.  To

consider these tax offenses against the backdrop of the sprawling allegations of the superseding indictment paints a misleading picture—allegations that have not been admitted and have effectively been abandoned at this stage of the proceedings.[1]

Mr. Davis began this case on a pretrial bond that carried with it a number of strict conditions. These conditions included an 8 p.m. to 8 a.m. curfew requirement, GPS monitoring, and frequent drug testing. Mr. Davis has remained on bond throughout this case and has faithfully complied with all conditions of his release. He has reported to multiple probation officers throughout his time on bond and has never had a single alleged violation of the various conditions imposed. Over time and as a result of his compliance, these conditions have been removed.

## II.   REMAINING OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

The table below summarizes the parties' Guidelines calculations with Mr. Davis's objections following.

| Government/PSR | | | | Mr. Davis | |
|---|---|---|---|---|---|
| 2T1.1(a) (Base Offense Level) | Tax Loss greater than $550,000 but not greater than $1,500,0000 | 20 | | Tax Loss not greater than $100,000 | 14 |
| 2T1.1(b)(1) | Over $10,000 in income derived from criminal activity | 2 | | | |
| 2T1.1(b)(2) | Sophisticated Means | 2 | | | |
| 3C1.1 | Obstruction of Justice | 2 | | | |
| 3E1.1 | Acceptance of Responsibility | -3 | | Acceptance of Responsibility[2] | -2 |
| | Total Offense Level | 23 (46-57 Mos. in Zone D) | | | 12 (10-16 Mos. in Zone C) |

---

[1] In regard to the background context of the superseding indictment's allegations of fraud and money laundering, it is helpful to recognize that not only has Mr. Davis's partner, Mr. Pinchot, not been charged with any wrongdoing, but also that the government has brought no criminal charges against SpotOption—the original Israeli trading platform according to the PSR on which Dale Pinchot and Mr. Davis operated a white label brokerage—or its principals.  Rather, the Government has opted just for a civil SEC enforcement action. Criminal charges and convictions have arisen out of binary-options brokerages where those brokerages engaged in identifiable fraudulent conduct. But it is wrong and misleading to consider any and all binary-options brokerages as per se violations of federal criminal law, and the United States Attorney's Office for the Northern District of Ohio should rightly be given credit for abandoning such a position in this case. The Court's background context would therefore be much more accurate if it adhered to those facts agreed upon by the parties and not the allegations of the superseding indictment, as the final PSR did.

[2] As the offense level prior to application of the acceptance of responsibility adjustment is less

## A.      The Tax Loss is not Greater than $100,000

Three numbers have been circulated as the tax loss in this case: $835,637.00, $232,747.00, and $83,902.00. The third—$83,902.00—is the correct figure on the facts and the law of this case.

The first two numbers were calculated by IRS-CID in its report recommending prosecution. IRS-CID analyzed the receipt of money from investors into the operating bank accounts of the binary-options business of Mr. Pinchot and Mr. Davis. The report then considered whether to give credit for what agents had identified as expenses of the business, that is, outgoing payments to affiliate marketers and to the software platforms on which the business operated. If those expenses were allowed, then the report identified the criminal tax loss as $232,747.00, and if they were not allowed, then the loss would be $835,637.00.

Neither calculation took into account any other deduction that Mr. Davis could legitimately have claimed. For one example, following his divorce, Mr. Davis paid alimony, which would have been deductible. For another, the IRS-CID report did not consider any expenses properly deductible as business expenses—like travel—that were not paid out of the binary-options bank accounts.

Counsel therefore engaged Chaise Kahlenbeck, CPA, to consider these expenses. Relying on QuickBooks that were drawn directly from bank records—and therefore not subject to reasonable dispute—Mr. Kahlenbeck created draft tax returns for the years in question that did account for deductible expenses. Using a conservative approach to claiming deductions, Mr. Kahlenbeck determined that the total tax loss was $83,902.00. Those draft returns, along with the supporting documentation, were provided to the probation officer and are attached hereto. *See* Draft Tax Returns attached hereto as Exhibit 1.

Application Note 3 to USSG §2T1.1 states, in pertinent part, that "[i]n determining the tax loss, the court should account for the standard deduction and personal and dependent exemptions to which the defendant was entitled. In addition, the court should account for any unclaimed credit, deduction, or

than 16, a downward adjustment of only two levels is permitted.  *See* USSG §3E1.1(b).

exemption that is needed to ensure a reasonable estimate of the tax loss."  To be sure, said deductions (1) must be "related to the tax offense and could have been claimed at the time the tax offense was committed;" (2) must be "reasonably and practicably ascertainable;" and (3) the defendant "presents information to support the credit, deduction, or exemption sufficiently in advance of sentencing to provide an adequate opportunity to evaluate whether it has sufficient indicia of reliability to support its probable accuracy." *Id.* The only limit is that "the court shall not account for payments to third parties made in a manner that encouraged or facilitated a separate violation of law (*e.g.,* 'under the table' payments to employees or expenses incurred to obstruct justice)." *Id.*

Here, IRS-CID itself identified the business expenses paid out of the binary-options business accounts that were properly deductible. Accounting for those deductions placed the total tax loss at $232,747. Further, properly deductible business expenses identified by Mr. Kahlenbeck (and not by IRS-CID, because the expenses were not paid out of the binary-options bank accounts that IRS-CID examined) reduce that number to $83,902.00, which is the correct amount.

It is correct because, first, there is no basis for declining to account for business expenses that IRS-CID itself identified from the binary-options bank accounts. The initial PSR explained the two different calculations ($835,637.00 and $232,747.00) at paragraph 40 and identified the loss amount as $232,747.00 at paragraph 50. The final PSR, however, omits that discussion, asserts without explanation at paragraph 40 that "the deductions for binary options-specific expenses were disallowed," and identifies the loss amount as $835,637 at paragraph 50.

There is no explanation as to why binary options-specific expenses should be disallowed under USSG 2T1.1, nor could there be. In responding to Mr. Davis's objection to paragraph 50, the report quotes the IRS-CID special agent assigned to the case, as follows: "Section 162(c)(2) of the Internal Revenue Code directs that deductions not be allowed for among other things, payments that themselves are illegal. The burden of this proof is on the government to demonstrate that the payments fall under this subsection and are disallowed. Arguably any expenses paid with investors funds that furthers the

binary options scheme would qualify as money laundering and be subject to disallowal under § 162(c)(2)." But the government has not put forward any proof at all (much less a preponderance) that any of these expenses themselves constitute money laundering. Therefore, the report is incorrect to decline to credit business expenses that IRS-CID has itself identified for the years in question.

The report also errs in declining to credit the deductions identified by Mr. Kahlenbeck, which were based on payments from accounts other than those IRS-CID examined. According to the response to Mr. Davis's objection, these deductions were not credited because "according to the case agent, the documentation provided does not qualify as sufficient supporting documentation." That is incorrect. Mr. Kahlenbeck relied on documentation from QuickBooks that was drawn directly from bank records, and from other reliable documentation, such as a copy of the agreement to pay alimony. If helpful to the Court in resolving this issue, Mr. Kahlenbeck is prepared to testify that this documentation is entirely standard in the preparation of tax returns and is of the same type that he would ordinarily rely on in preparing returns. Thus, this information "has sufficient indicia of reliability to support its probable accuracy" and has been ascertained. These deductions should therefore be accounted for in the tax loss.

Accounting for the deductions for business expenses identified by IRS-CID and by Mr. Kahlenbeck, the total tax loss is $83,902.00.

## B.    There is Insufficient Evidence of More Than $10,000 from Criminal Activity

Paragraph 51 of the PSR assigns a two-level increase to Mr. Davis for receiving more than $10,000 in income from criminal activity, but that has not been established Under USSG 2T1.1(b)(1), the increase is appropriate where a defendant fails to report a "source of income exceeding $10,000 in any year from criminal activity." Here, the plea by Erie Marketing, LLC and agreed restitution in that case shows that the binary-options brokerage owned by Messrs. Pinchot and Davis received $501,971 in *gross receipts* from criminal activity over the lifetime of the existence of the business. But gross receipts to a business do not necessarily yield any income to one of the owners of that business. As referenced above in the discussion of tax loss and as acknowledged in the plea agreement at paragraph 28, the expenses for the business were very high. Although it seems possible that income to Mr. Davis from the

business was over $10,000 from criminal activity (based on gross receipts to the business from criminal activity totaling just over $500,000 over the life of the business), that showing has not been. The enhancement therefore should not be applied.

### C.    Mr. Davis's Offense Conduct Did Not Employ Sophisticated Means

Paragraph 52 of the PSR assigns a two-level increase to Mr. Davis for employing sophisticated means with regard to his offense conduct.  Merely because the offense conduct may be sophisticated *per se* does not warrant application of this enhancement.  Only where the offense conduct is committed in a sophisticated manner *relative to* other similar tax offenses should it be applied, hence the requirement that the conduct be "***especially*** complex or ***especially*** intricate." USSG §2T1.1, comment. (n.5) (emphasis added); USSG App. C, Amend. 617 (effective Nov. 1, 2001) (recognizing that "certain tax offenses can be committed in a sophisticated manner"). Otherwise, this enhancement would automatically be applied in virtually every case involving tax fraud.  Illustrating this enhancement's very limited application is the fact it was applied in 13.5% of cases in FY 2021.  *See* U.S. Sentencing Comm'n, *Use of Guidelines and Specific Offense Characteristics Guideline Calculation Based Fiscal Year 2021*, at 183, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2021/Ch2_Guideline_Based.pdf.

Indeed, while Mr. Davis's conduct involved the use of shell companies, nominees, and foreign accounts to operate the binary options business, there is no dispute that **Mr. Davis repatriated the profits from that business to domestic accounts** and simply did not pay the taxes due and owing on those profits. Simply not paying taxes on money deposited into one's domestic bank account does not involve sophisticated means and clearly those offshore accounts were not used to cover up the offense in an especially sophisticated manner.

### D.    Mr. Davis Did Not Obstruct Justice

Paragraphs 46 and 55 assign a two-level increase to Mr. Davis for obstruction of justice. According to the PSR, "[t]he defendant moved his e-mail account to a Swiss host that did not respond to the legal process, following the search warrant of the Sandusky call center and service of grand jury subpoenas."  ECF No. 109 at 13 (Page ID # 1468).  In fact, Mr. Davis's email address was moved, along with dozens of other email addresses, by business IT personnel from one server to another to lower

business expenses. The decision to transition servers for the entire company was made to cut costs and to increase the security over sensitive customer information such as credit cards and identification information. Although this took place chronologically after the execution of a search warrant at the Sandusky call center, plans for the transfer were in place before the search warrant.

In that regard, no emails were hidden or concealed from any investigator, and there was no obstructive purpose to the transfer.  Moreover, Mr. Davis cannot be held responsible for the conduct of a third-party, server host located in a foreign country. As set forth in Application Note 9 to USSG §3C1.1., "the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused."  There is no evidence that Mr. Davis in any way caused, counseled, commanded, or induced the foreign server host to not comply with the subpoena (assuming it was issued and served consistent with Swiss law).  In short, Mr. Davis cannot be held responsible for the Swiss host's failure to respond to legal process. Therefore, an adjustment for obstruction is not appropriate.  *See* Affidavit of Jonathan Castro attached hereto as Exhibit 2.

## III.   HISTORY AND CHARACTERISTICS OF MR. DAVIS

Despite the instant offense conduct, Mr. Davis nevertheless is a devoted, caring man, not only to his family, but to his community.  According to his wife Elisabeth,

> Jared has devoted himself to being a wonderful husband to me, father to our two young children, and citizen of his community. He picks his son up from school every day, walks the halls with our colic-y [sic] daughter at 3am and encourages me to pursue a life of meaning and purpose. He strives to be involved in his community by supporting the local Nantucket foodbank and the Cincinnati foodbank where my father[3] volunteered, donates to the women's shelter, provides an academic scholarship to a local student, and sends yearly donations to the ministry for underserved youth in Cincinnati where my brother volunteered.

Ex. 3 at 1.

Even his ex-wife Kasia attests to the same.

During our relationship, Jared was always supportive and immensely

---

[3] Elisabeth's father died unexpectedly on February 1, 2022. *See* Obituary of John Earl Imhoff, Feb. 9, 2022, at https://www.cincinnati.com/obituaries/cen211791. Mr. Davis continues to support the Cincinnati foodbank in honor of his late father-in-law.

helpful in fulfilling my dreams. It was challenging to begin higher education in a foreign language, but Jared went above and beyond to help me succeed academically; he was a mentor, friend, and partner. While busy with his career, he always found the time to guide me and provide all the support I needed. I can say that I owe my academic success to Jared.  Even though we ended our marriage a few years later, Jared never stopped being a caring person. During our separation, he assured me I had finished my last semester at Denison University and never stopped being a responsible pet parent. Until this day, Jared takes full financial responsibility for our dogs. When we parted ways, Jared ensured that I and our pets were safe and that I had sufficient resources to start my new life in Philadelphia. I always saw Jared as a generous and loving person. During our marriage, I remember his relationship with his family, specifically with his biological father, who struggled with health problems. Jared cared incredibly for him from the day we met until his father's passing. He took full responsibility for him, including grocery shopping, doctor's appointments, and assuring he was not alone.

Ex. 3 at 5.

Such consistent, altruistic devotion also is exhibited in his continued commitment to charity, as exhibited below:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



**Board of Directors**

*President*
Linda Hoey

*Vice-President*
Jane Loose

*Vice-President*
Suellen Ward

*Treasurer*
Marcia N. Anderson

*Clerk*
Janine Mauldin

Jessie Glidden Brescher
Jason Bridges
Maria Carey
John Copenhaver
Sheila Daume
Aldenora Greenleaf

December 20, 2021

JJ Davis
PO Box 1450
Nantucket, MA 02554

Dear JJ,

Your generous donation of $5,000.00 was such a wonderful surprise! I noticed that this was your first time donating to A Safe Place and I cannot tell you how much I appreciate your support for the life changing services that we are providing to survivors of domestic violence and sexual assault on Nantucket.

Here at A Safe Place, our mission is to eliminate domestic violence and sexual assault in the Nantucket community and to empower every woman, man, and child to live a life free from violence. Last year we provided supportive and therapeutic services to 317 survivors and their non-offending loved ones. Additionally, our trained staff provided prevention education programs to hundreds of children on Nantucket. If you are interested in learning more about our services, I would encourage you to reach out. I love giving tours of our office space and teaching the community more about what it is





Jared's friend Joel writes:

> I have not been blessed with the best health, being diagnosed with Cystic Fibrosis at 15 months old.  One of the biggest Cystic Fibrosis fundraisers is called Great Strides, which is a walkathon where a team leader sponsors a team and gathers sponsors to support the cause.  My wife decided to sponsor a team and Jared not only made a significant contribution for this cause, but he also showed up to walk with the team.  Unfortunately, I was on oxygen 24/7 and could not attend, but for Jared to show up in my honor and participate means a great deal to my wife and me.
>
> As my health continued to decline, I had to undergo a double lung transplant due to respiratory failure in December of 2015.  During this difficult time, which required a three-month hospital stay, Jared was in constant contact with my wife asking how he could help.  Once I got out of the ICU, he came for one of his many visits to UPMC Presbyterian hospital in Pittsburgh to check in on me and bring me anything I needed (specifically food, which is of particular importance during a three-month hospital stay).
>
> When I was finally discharged from the hospital in the spring of 2016, my friends at home had a benefit golf tournament for me to help with the expenses of transplant.  Without me knowing, Jared showed up on the day of the golf tournament to volunteer his time and assist with the logistics of the tournament.  He went out of his way to make sure things ran smoothly and ensured that everyone who played had a great experience.

Ex. 3 at 6.

## IV.  <u>SENTENCING STATISTICS FOR SIMILARLY SITUATED OFFENDERS</u>

Mr. Davis is to be sentenced under USSG §2T1.1.  Like the fraud Guideline at USSG §2B1.1, this Guideline has been subject to increasing rates of downward variance as indicated by the trend chart below.[4]  As illustrated below, the rate of court-initiated downward variances for tax offenses sentenced under USSG §2T1.1 has more than doubled since *Booker* from 31.8% in fiscal year 2006 to 68.9% in fiscal year 2021.



As noted above, the PSR calculates Mr. Davis's Total Offense Level under USSG §2T1.1 to be 23 and his Criminal History Category to be I.  According to the PSR at Paragraph 124, from fiscal years 2017 through and including 2021, there were "16 offenders whose primary guideline was §2T1.1, with a Total Offense Level of 23 and a Criminal History Category of I, after excluding offenders who received a USSG §5K1.1 substantial assistance departure."  The PSR implies that one of the 16 offenders received a non-custodial sentence, i.e., probation or a split sentence of probation and home confinement or a halfway house. *See id.* The PSR then reports that, of the 15 that received a custodial sentence, the average sentence and median sentences were 36 months, *see id.*, which are 10 months below the minimum advisory sentencing range of 46 to 57 months.

---

[4] Undersigned counsel retained the services of SentencingStats, LLC (www.sentencingstats.com) to analyze U.S. Sentencing Commission datafiles and create these charts.  *See* Exhibit 4 (Declaration of Mark Allenbaugh, Chief Research Officer for Sentencing Stats, LLC).

Below is a boxplot, a commonly used visualization of the distribution of data also used by the U.S. Sentencing Commission when reporting on the distribution of sentences.[5] The boxplot illustrates the sentencing distribution for the 16 offenders identified in the PSR including the single non-custodial sentence.  As indicated, the "x" represents the average or mean sentence of 33.4 months.  The line bisecting the box represents the median sentence of 36.0 months.  The top of the box represents the Third Quartile (75th percentile) and the bottom of the box represents the First Quartile (25th percentile) thereby indicating that half (8) of this group of offenders received sentences between 24.0 and 44.5 months (and 75% received a sentence below 44.5 months).  Thus, a bottom-of-the-Guidelines sentence of 46 months would be higher than what the vast majority of similarly situated offenders received.



What is not shown is the amount of tax loss attributable to the offender.  The boxplot below shows the distribution of tax loss for these same 16 offenders.  As indicated, the average tax loss was nearly $3.3 million, and the median was just over $3.0 million.  Half of all offenders in this group had tax loss amounts ranging from just over $1 million to over $4.7 million.  The PSR's attribution of approximately $835,000 of tax loss to Mr. Davis is therefore well below the average and median tax

---

[5] *See* U.S. Sentencing Comm'n, *INTER-DISTRICT DIFFERENCES IN FEDERAL SENTENCING PRACTICES Sentencing Practices Across Districts from 2005 – 2017* 10 (Jan. 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200122_Inter-District-Report.pdf.

losses for this group of offenders; in fact, it is below what the majority of offenders were attributed in terms of tax loss.



As indicated previously, Mr. Davis's Total Offense Level is, in fact, only 12 in CHC I. Below is the boxplot for all 104 offenders from 2017 through and including 2021 whose primary guideline was §2T1.1, with a Total Offense Level of 12 in Criminal History Category of I, excluding offenders who were subject to a mandatory minimum or consecutive sentence, or who received a §5K1.1 substantial assistance departure. As reflected below, the average sentence was only 2.5 months and the median was, in fact, a non-custodial sentence. The vast majority of defendants received a sentence under five months.



Again, what is not shown is the amount of tax loss attributable to the offender.  The boxplot below shows the distribution of tax loss for these same 104 offenders.  As indicated, the average tax loss was $71,574, and the median was $70,622.  Half of all offenders in this group had tax loss amounts ranging from $56,620 to $90,049.  Mr. Davis's calculation of his tax loss to be $83,902 is thus well within the typical range of tax losses for this group of offenders.



## V.    COVID-19 AND ONEROUS CONDITIONS OF CONFINEMENT

Mr. Davis suffers from recognized comorbidities for COVID-19.  As set forth in the attached letter from Dr. Mark Lovinger, Exhibit 5, "[t]here are many indications that he suffers from a Generalized Anxiety Disorder (DSM-5 -300.02)."  According to a peer-reviewed study published by the CDC, "anxiety disorders were the strongest risk factors for severe COVID-19 illness."[6]

Moreover, as set forth in the attached letter from Asst. Dir. for Health Care in the BOP, Phillip S. Wise (ret.), Exhibit 6, "Mr. Davis has been diagnosed with psoriatic arthritis, a chronic, incurable auto-immune disorder for which he takes the prescription medication Humira (adalimumab), given by injection every two weeks at an approximate cost of $6240 per month.  Humira is not available on the BOP national formulary."  According to a peer-reviewed article published by the National Institutes of Health, "Coronavirus disease 2019 is a respiratory infection caused by severe acute respiratory syndrome coronavirus 2. Coronavirus disease 2019 leads to the rapid activation of innate immune cells, particularly in patients with severe disease. Psoriatic arthritis is a heterogeneous chronic inflammatory disease characterized by the association of psoriasis and arthritis. Similar to those with other viruses, **patients with psoriatic arthritis are at a significant risk of infection with severe acute respiratory syndrome coronavirus 2.** Patients with psoriatic arthritis are immunosuppressed owing to immune dysregulation during the active disease period or owing to immunosuppressive drugs administered during remission, and they are prone to infections."[7]

As this Court is well aware, for nearly the past three years we have remained in the midst of a global pandemic caused by a novel coronavirus.  *See, e.g.*, Thomas R. Frieden, former Dir. of the CDC, The Atlantic, *COVID-19 Is Out Of Control. What Can We Do About It?* (Nov. 13, 2020) ("The coronavirus is growing out of control. Deaths will likely increase to 2,000 people a day before the end of the year, and **the virus will be with us for much of 2021 and possibly longer**.") (Emphasis added).[8]

---

[6] *See* Kompaniyets L, Pennington AF, Goodman AB, Rosenblum HG, Belay B, Ko JY, et al., *Underlying Medical Conditions and Severe Illness Among 540,667 Adults Hospitalized With COVID-19, March 2020–March 2021*, Prev Chronic Dis 2021;18:210123. DOI: http://dx.doi.org/10.5888/pcd18.210123.

[7] Keskin Y, Koz G, Nas K. *What Has Changed in The Treatment of Psoriatic Arthritis After COVID-19?* Eurasian J Med. 2021 Jun;53(2):132-136 (emphasis added). doi: 10.5152/eurasianjmed.2021.20222. PMID: 34177297; PMCID: PMC8184027.

[8] Available at https://www.theatlantic.com/ideas/ archive/2020/11/covid-19-is-out-of-control-

Indeed, that prediction has unfortunately borne out all too well as there remain over a quarter million COVID-19 infections and several thousand deaths each week as of the instant filing and growing.[9] Moreover, "we have what can be characterized as a 'sub-variant soup' on our hands; a veritable mix of many different Omicron sub-variants competing with one another to try and dominate the SARS-CoV-2 space. This is a global phenomenon. Given the world population's ever-increasing mobility, both within borders of nations and beyond, such sub-variants wind up traveling between continents."[10]   Accordingly, "the pandemic is far from over."[11]

A large portion of those that develop COVID-19 likely will suffer life-long damage to their internal organs.

> Recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems such as the blood and immune systems. ***This damage is so extensive and severe that it may be enduring.*** Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward. Indeed, studies of some recovered patients in China and Hong Kong indicate a declined lung function of 20% to 30% after recovery.

*Ruderman v. Kolitwenzew*, No. 20-cv-2082, 2020 U.S. Dist. LEXIS 83163, *5-6 (C.D. Ill. May 12, 2020) (emphasis added; citations omitted); Kathryn Krawczyk, The Week, *Even Mild Coronavirus Cases Can Cause Lasting Cardiovascular Damage, Study Shows* (July 28, 2020) (reporting on "a recent study of 100 recovered coronavirus patients reveals 78 of them now have ***lasting cardiovascular damage*** even though a vast majority of them had mild cases of COVID-19 in the first place") (emphasis added), https://theweek.com/speedreads/927908/even-mild-coronavirus-cases-cause-lasting-cardiovascular-damage-study-shows (last visited July 28, 2020); Michelle Fay Cortez, Bloomberg, *Covid Raises Blood Clot, DVT Risks for Months After Even Mild Infection* (Apr. 7, 2022) ("The risk of

what-can-we-do/617097/.

[9] *See* CDC, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory*, at https://covid.cdc.gov/covid-data-tracker/#trends_weeklycases_select_00 (last visited Oct. 25, 2022).  The CDC converted to reportingly cumulative weekly infections and deaths on October 20, 2022. *See id.*

[10] Joshua Cohen, *Europe's Emerging Covid-19 Wave Reminds Us That The Pandemic Isn't Over 'Til It's Over*, Forbes, Oct. 6, 2022, https://www.forbes.com/sites/joshuacohen/2022/10/06/europes-emerging-covid-19-wave-reminds-us-that-the-pandemic-isnt-over-till-its-over/.

[11] *Id.*

developing serious bleeding or potentially deadly blood clots is elevated for months after experiencing even a mild Covid infection, Swedish researchers found.").

More alarmingly, the mortality rate of COVID-19 is at least 10 times greater than seasonal flu. *See* Jake Ellison, UW News, *COVID-19: UW Study Reports 'Staggering' Death Rate in US Among Those Infected Who Show Symptoms*, (May 18, 2020), https://www.washington.edu/news/2020/05/18/ covid-19-uw-study-reports-staggering-death-rate-in-us-among-those-who-show-symptoms/. In that regard, "[a] new study . . . found that on average, those who died from COVID-19 **lost more than a decade of their life to the disease**." Joseph Guzman, The Hill, *New Study Finds Coronavirus Can Cut Life Span by 10 Years or More*, (May 11, 2020) (emphasis added), https://thehill.com/changing-america/well-being/longevity/497097-those-who-died-from-covid-19-lost-more-than-a-decade-of. So deadly has COVID-19 been that it resulted in a "historic decline" in life expectancy in the United States. *See* Deidre McPhillips, CNN, *US life expectancy continues historic decline with another drop in 2021, study finds* (Apr. 8, 2022) (noting that COVID-19 has led to the most "dramatic decline" in life expectancy since World War II), https://www.cnn.com/2022/04/07/health/us-life-expectancy-drops-again-2021/index.html.

While the virus has spread quickly within the United States, it is estimated to spread nearly four times more quickly within prisons.  *Compare* Lisa B. Puglisi, M.D., et al., *Estimation of COVID-19 Basic Reproduction Ratio in a Large Urban Jail in the United States*, 53 Ann. Epidemol. 103-105 (Jan. 2021) (estimating the basic reproduction rate ("$R_0$") at 8.44 within jails and prisons), https://www.ncbi.nlm. nih.gov/pmc/articles/PMC7480336/; *with* Joe Hilton, et al., *Estimation of country-level basic reproductive ratios for novel Coronavirus (SARS-CoV-2/COVID-19) using synthetic contact matrices*, 16(7) PLoS Comput. Biol. (July 2020) (estimating national $R_0$ to be between 2.22 and 2.47), https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC7363110/.

According to the New York Times, "[i]n federal facilities, at least 39 percent of prisoners are known to have been infected. The true count is most likely higher because of a dearth of testing, but the findings align with reports from The Marshall Project, The Associated Press, U.C.L.A. Law and The COVID Prison Project that track Covid-19 in prisons. The virus has caused misery and loss in many places, but its destructive power has been felt intensely among the incarcerated, who have been infected

at rates several times higher than those of their surrounding communities."  Eddie Burkhalter, et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System* (Apr. 10, 2021), https://www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html. In fact, COVID-19 appears to be perhaps the deadliest event in the history of the BOP.

**The Quickly Evolving, Immunity Evasive Omicron Variants**

"A stunning 300 spinoffs of the omicron variant – almost all iterations of each other, with many shared mutations — are circulating globally right now. This represents a new evolutionary phase in the pandemic. Until now, one version of the virus has been king."[12]  At least 12 subvariants of the omicron variant—all classified as variants of concern—are now circulating in the United States alone.[13] Additionally, there now is present the "nightmare variant"—dubbed XBB—which "is extremely immune evasive and has also shown that it might be immune to current vaccines."[14]

Now, as winter closes in, another surge is feared, especially as case counts have increased significantly in Europe. "The situation in Europe 'may be a harbinger of things to come,' [Michael] Osterholm, [director of the Center for Infectious Disease Research and Policy at the University of Minnesota,] says. He fears a 'perfect storm' may be brewing, threatening to turn that U.S. plateau into another surge. Waning immunity, low booster uptake, ever-evolving subvariants that are increasingly good at evading the immune system, and people behaving as if the pandemic is over all suggest 'we are headed to the end of the high-plains plateau,' Osterholm says. 'I just don't know what [the next phase] looks like.'"[15]

According to a declaration recently filed in a class action against the U.S. Immigration and Customs Enforcement agency on behalf of detainees, Dr. Eric Feigl-Ding, a Senior Fellow at the

---

[12] Lisa M. Krieger, *A stunning 300 new COVID variants are circling the globe. Which ones will break through in the Bay Area?*, The Mercury News, Oct. 24, 2022, https://www.mercurynews.com/2022/10/24/a-stunning-300-new-covid-variants-are-circling-the-globe-which-ones-will-break-through-in-the-bay-area/.

[13] CDC, *Variant Proportions*, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited Oct. 25, 2022).

[14] Mary Markos, 'Nightmare' XBB Variant Likely Already Here, Boston Doctors Say, NBC News Boston, Oct. 25, 2022, https://www.nbcboston.com/news/local/nightmare-xbb-variant-could-already-be-here-boston-doctors-say/2872813/.

[15] Jamie Ducharme, *We May Be in for Yet Another COVID-19 Surge This Fall and Winter*, Time, Oct. 11, 2022, https://time.com/6221152/covid-19-surge-winter-2022/.

Federation of American Scientists and *inter alia* member of the World Health Organization ("WHO") and United Nations' ("UN") COVID-19 Mortality Committee, states that "[d]ue to the highly transmissible Omicron variant, case numbers, hospitalizations, and deaths due to COVID-19 have been high and are likely to increase with the recent emergence of the BA.2 sublineage of Omicron and the likelihood of future variants."[16]

As Dr. Feigl-Ding further explains, "[t]he recently-identified BA.2 sublineage of Omicron is significantly more infectious than the BA.1 sublineage of Omicron, and seems to be even more severe. In addition, **studies suggest that infection with Omicron does not protect individuals from future reinfection**. In addition to the immediate risk posed by the BA.2 sublineage, each new infection provides the COVID-19 virus another opportunity to mutate and therefore produce even more transmissible and dangerous future variants."[17]

As Dr. Feigl-Ding also states, "**[o]ver the course of the pandemic, higher case and death rates have been observed in prisons than in the general population. For the Omicron variant, too, the Rt [rate of transmission] has been significantly high in carceral settings.**"[18] "Not only is the BA.2 sublineage of Omicron more transmissible, it is also linked to worse health consequences. In countries like Denmark where the BA.2 sublineage is dominant, excess deaths caused by the virus are spiking. A recent study out of Japan which tested different variants on hamsters demonstrates that '[t]he viral RNA load in the lung periphery and histopathological disorders of BA.2 were more severe than those of BA.1 and even B.1.1.' The study raises serious concerns about the BA.2 sublineage, as it concluded that the 'data suggest[s] the possibility that BA.2 would be the most concerned variant to global health' and 'propose that BA.2 should be recognised as a unique variant of concern, and this SARS-CoV-2 variant should be monitored in depth.'"[19]

As Dr. Feigl-Ding thus rightly observes, "[t]he Omicron wave is far from over. Although nationally cases are for now trending downward, the emergence of the even more transmissible BA.2

---

[16] *See Miguel Escalante, et al. v. U.S. Immigration and Customs Enforcement, et al.*, 1:22-cv-00541-RJL (D.D.C. March 1, 2022) (Doc 2-6.), (Declaration of Dr. Eric Feigl-Ding, Sc.D.).

[17] *Id.* at 2 (emphasis added; footnotes omitted).

[18] *Id.* at 3 (emphasis added; footnotes omitted).

[19] *Id.* at 8 (footnotes omitted).

sublineage as well as the greater likelihood of reinfection after infection with Omicron—in comparison to reinfection after infection with Delta—show that **the serious threats posed by Omicron and COVID-19 is ongoing**."[20]  And the virus continues to mutate.

In light of the above, it is very disconcerting that the BOP's testing regime remains lower than at any time since the onset of the pandemic, as indicated in the graph below.  Indeed, the BOP has been consistently reporting exactly 136 pending tests since February 16, 2022, thereby suggesting that **no active testing is taking place**. This makes the BOP effectively blind to Omicron and its hundreds of variants and subvariants, which is especially problematic given that they easily evade detection by the rapid tests used by the BOP.[21]

**Exacerbating the BOP's vulnerability to COVID-19 is the fact that the BOP does not even report the number of booster shots it has administered to inmates** thereby indicating the BOP has lost all meaningful visibility on the vaccination status of the inmate population as a whole.[22] Furthermore, on March 29, 2022, the CDC recommended that those 50 years of age or older receive a second booster (fourth shot overall).[23]  Approximately 20% of the current BOP inmate population is at least 50 years of age.[24]  And now a fifth "bivalent" booster is recommended.[25]

This renders the entire inmate population, staff and surrounding community exposed because the efficacy of prior vaccinations is now known to be wearing off.[26]  As the BOP notes in its COVID-19

---

[20] *Id.* at 4 (emphasis added).

[21] *See* Hilary Brueck and Shayanne Gal, *Rapid Tests Do Not Always Detect Omicron — Here's How to Know for Sure If You've Got COVID-19 or Not*, BusinessInsider, Dec. 23, 2021, https://www.businessinsider.com/how-to-trust-rapid-covid-test-result-2021-12.

[22] *See* BOP, *COVID-19 Coronavirus*, "Coronavirus Vaccine Implementation," ("*The figures below do not include any additional booster shots given.*") (Emphasis in original), at https://www.bop.gov/coronavirus/.

[23] *See* CDC, Media Statement, *CDC Recommends Additional Boosters for Certain Individuals*, at https://www.cdc.gov/media/releases/2022/s0328-covid-19-boosters.html.

[24] *See* BOP, *Inmate Age*, https://www.bop.gov/about/statistics/statistics_inmate_age.jsp.

[25] *See* CDC, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States* ("People ages 5 years and older are recommended to receive 1 bivalent mRNA booster dose after completion of any FDA-approved or FDA-authorized monovalent primary series or previously received monovalent booster dose(s).") (Last visited Dec. 8, 2022), https://www.cdc.gov/vaccines/covid-19/clinical-considerations/interim-considerations-us.html.

[26] Maggie Fox, *Studies Confirm Waning Immunity from Pfizer's Covid-19 Vaccine*, CNN, Oct. 7, 2021, https://www.cnn.com/2021/10/06/health/pfizer-vaccine-waning-immunity/index.html.

Vaccine Guidance, "[i]nmates who are not moderately to severely immunocompromised and who received the Pfizer-BioNTech COVID-19 vaccine as their primary 2-dose vaccination series **should be offered a booster dose *at least 6 months after the second dose*."[27]  The BOP, however, is simply incapable of fully vaccinating enough inmates quickly enough to adequately protect inmates, staff, and surrounding communities from the ravages of COVID-19.**

Even if the BOP could fully and timely vaccinate all inmates as well as administer boosters, vaccines alone do not prevent the spread of the of the virus.

> [B]oth the unvaccinated and vaccinated can nevertheless "acquire and spread" the SARS-CoV-2 virus. Unlike certain sterilizing vaccines (such as the small pox vaccine at issue in *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905)), the **vaccines for COVID-19 are, by design, non-sterilizing. As such, they do not kill the underlying virus like some traditional vaccines (i.e., they cannot clear and prevent an infection from taking hold), and thus, the vaccines for COVID-19 cannot affirmatively preclude vaccinated persons from either contracting or transmitting the SARS-CoV-2 virus**. Indeed, asymptomatic transmission by both vaccinated and unvaccinated persons may account for more than half of all transmission. *See, e.g.*, S.V. Subramanian and Akhil Kumar, *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States* (Sept. 9, 2021), available https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8481107/pdf/10654_2021 _Article_80 8.pdf (last visited Dec. 6, 2021) (finding that "[t]here also appears to be no significant signaling of COVID-19 cases decreasing with higher percentages of population fully vaccinated."). In view of these developments, the CDC updated its masking policy recommendation to cover all persons regardless of vaccination status, as both groups are fully capable of virus transmission.

*Halgren v. City of Naperville*, No. 21-cv-05039, 2021 U.S. Dist. LEXIS 241777, *9-12 (N.D. Ill.) (emphasis added; footnotes omitted).  Indeed, even boosters are not expected to provide protection for more than a few weeks.[28]

/ / /

/ / /

/ / /

---

[27] *Federal Bureau of Prisons Clinical Guidance* at 1, Oct. 13, 2021, https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf.

[28] *See* Joseph Wilkinson, *Second COVID booster shot boosts infection protection for just a few weeks: study*, New York Daily News (Apr. 6, 2022), https://www.nydailynews.com/coronavirus/ny-covid-second-booster-protection-against-infection-pfizer-20220406-g6swul3phjcmjj5fc2d3zgqjum-story.html.

This is particularly troubling given that COVID-19 has already killed at least 309 inmates in less than three years[29] whereas it took AIDS and homicide 18 years to kill just 167 and 182 inmates respectively as illustrated in the chart below.



As Judge Posner once observed, "the courtroom is not the place for scientific guesswork, even of the inspired sort. **Law lags science**; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (emphasis added).  "It is apparent that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided." *United States v. Powell*, No. 19-cr-00061, 2020 U.S. Dist. LEXIS 62077, *1-*2, 2020 WL 1540485 (N.D. Cal. Mar. 27, 2020) (Illston, J.); *United States v. Huang*, No. 19-cr-00110, 2020 U.S. Dist. LEXIS 58355, *1-*2, 2020 WL 1540483 (N.D. Cal. Mar. 27, 2020) (Illston, J.); *United States v. Garlock*, No. 18-cr-00418, 2020 U.S. Dist. LEXIS 53747, *1-*2, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) (Chhabria, J.).

Indeed,

> Public health experts cautioned that, in custodial settings, effective medical isolation and quarantine required that facilities reduce crowding and initiate other aggressive population management strategies. The experts emphasized that "**the most urgent first-line strategy to limit spread and improve containment is population reduction.**" The more populous the setting, the more difficult distancing becomes--and overcrowding in detention facilities was a particularly stark challenge. On March 13, 2020,

---

[29] This does not include 18 inmates who died in private facilities and seven staff.

> the World Health Organization (WHO) issued a joint statement with other international organizations containing guidance on preventing the spread of COVID-19 in custodial settings, and it emphasized that overcrowding is an "insurmountable obstacle" to COVID-19 response. The WHO put out a formal report two days later, recommending decarceration and the standard COVID-19 protocols recited above. In October 2020, the [National Academy of Sciences] committee tasked with studying the public health response to COVID-19 in custodial settings issued a report with similar recommendations. It also underscored that conditions modifications had to be coupled with discharge strategies: "**[D]ecarceration is an appropriate and necessary mitigation strategy to include in the COVID-19 response in correctional facilities** . . . ." Underscoring the importance of the WHO and NAS recommendations more quantitatively, one widely-cited study showed that a 9 percent drop in an urban jail population reduced transmission by 56 percent.

Brandon L. Garrett & Lee Kovarsky, *ARTICLE: Viral Injustice*, 110 Calif. L. Rev. 117, 128-129 (2022) (emphasis added; footnotes omitted).

While this matter has been resolved in a way that all parties are comfortable with, the amount of time it has drawn on and the toll it has taken on Mr. Davis and his family is unquantifiable. There is no question that Mr. Davis is no longer the man he was when this investigation and case began over six years ago. In that time, Mr. Davis experienced loss, happiness, financial strain, growth, significant health issues, and some success.

Mr. Davis's physical health conditions discussed previously are life-changing and have certainly been exacerbated by the stress of this case. Further, his mental health, as discussed by Dr. Mark Lovinger in Exhibit 5, has also taken a negative turn. He and his family have been held in a state of utter limbo while they await the criminal process to conclude. The Davis family has lived under the constant threat of the loss of Mr. Davis's freedom for the last six years and this alone has had a lifelong impact on the family's quality of life.

Financially, he has suffered. Through no fault of his own, Mr. Davis had to acquire two new sets of lawyers since his original counsel was hired. This has caused him to incur exponentially higher legal fees. Mr. Davis also suffered the loss of both his father and father-in-law in the last several years. Mr. Davis was exceptionally close with both of these men and their loss has had a profound impact on him.

Fortunately, Mr. Davis has also used this time wisely and created a growing and loving family. He and his wife, Elisabeth Imhoff, were married in 2017 and have two beautiful children together. Their

son, Aaron Benjamin Davis (3 years), and daughter, Millicent Rose Davis (3 months) mean everything to Mr. Davis and his wife. *See* Davis Family Photo attached hereto as Exhibit 7. The family relocated to Nantucket, Massachusetts where they have created a wonderful life within the community. Finally, Mr. Davis has both closed businesses and successfully began new ventures that assist in supporting his family.

The last six years have had a profound impact on Mr. Davis and the trajectory of his life. As a person, husband, father, and entrepreneur, he has evolved and grown in a tremendous and positive way.

## VI.    CONCLUSION

For the reasons set forth above, Mr. Davis respectfully recommends that this Honorable Court impose on him a non-custodial sentence of three years' supervised release conditioned on the agreed upon maximum statutory fine of $300,000.00.


Dated:  December 28, 2022.                          IAN FRIEDMAN


                                                    */s/ Ian N. Friedman*

                                                    Ian N. Friedman
                                                    Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2022, the foregoing MEMORANDUM IN AID OF SENTENCING was filed electronically and a copy was served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/Ian N. Friedman*
IAN N. FRIEDMAN
Attorney for Defendant